UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

JESSE J. BRYANT                        *        CIVIL ACTION NO.  12-2378

VERSUS                                 *        MAG. JUDGE KAREN L. HAYES

CITY OF MONROE AND DON                 *
HOPKINS

MEMORANDUM RULING

Pending before the court is a motion for summary judgment [doc. # 35] filed by

Defendants, the City of Monroe and Don Hopkins.  With the consent of all parties, the District

Court referred the above-captioned case to the undersigned magistrate judge for the conduct of

all further proceedings and the entry of judgment.  28 U.S.C. § 636(c).  For reasons assigned

below, the motion is GRANTED.

Background

On September 13, 2012, Jesse Bryant filed the instant civil rights action pursuant to 42

U.S.C. § 1983 against Defendants, the City of Monroe (the "City") and Don Hopkins, the City's

Sanitation Superintendent for the Department of Public Works.  (Compl.).  Bryant contends that

on January 19, 2012, the City unlawfully discharged him from employment after he tested

positive for marijuana on a post-accident drug screen, notwithstanding his previously

unblemished 20 year tenure with the City.  Plaintiff contends that the City's drug screening

policy violates his rights under the Fourth Amendment to the U.S. Constitution and Article I § 5

of the Louisiana Constitution.  He further alleges that the City violated his substantive due

process rights under the U.S. and Louisiana constitutions when it terminated his employment

without cause or legal justification as required by the collective bargaining agreement ("CBA") that was in effect between the City and its employees.  Bryant seeks resulting compensatory and punitive damages under 42 U.S.C. § 1983 and applicable state law, plus costs, expenses, and attorney's fees.  He also seeks reinstatement to his former position with the City.

On August 15, 2013, Defendants filed the instant motion for summary judgment seeking dismissal of Plaintiff's claims in their entirety.  Bryant filed his opposition on September 10, 2013.  Defendants filed a reply memorandum on September 17, 2013; Plaintiff filed a sur-reply on October 7, 2013.  The matter is now ripe.

## Summary Judgment Standard

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine

2

issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate.  *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor.  *Anderson*, 477 U.S. at 255.  While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322-323.  The non-moving party may not merely rely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a *scintilla* of evidence.  *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'"  *Little, supra* (citation omitted) (emphasis in original).  In other words, summary judgment is warranted if no reasonable juror could return a verdict in favor of the non-movant.

3

## Relevant Facts

a)      Bryant's Job

Bryant began his employment with the City on July 5, 1991, as a laborer in the Cemetery

Division of the Public Works Department.  (Bryant Depo. Def. MSJ, Exh. 5, pgs. 33-34, 51).  He

held various positions over the years, and by the time of his discharge, had attained the position

of labor leader in the City's Department of Public Works Beautification Division.  *Id*.  Bryant's

latest job placed him in charge of a five to six person crew, which he drove around in a city-

owned F-350 pickup truck[1] while sometimes pulling a trailer with lawn mowers or four-wheel

"Gators."  *Id*., pgs. 52-53.  However, not only was Bryant responsible for his crew's safety, he

also assisted them with their work duties, which included, *inter alia*, maintenance of the grassy

medians and right of ways along I-20 and Louisiana Highway 165 within the city limits.  *Id.*, pgs.

53-59.  The crew's equipment included two large tractors and a slope mower, plus the four-

wheeled Gators.  *Id*., pg. 52.[2]  The two large tractors pulled three large folding blades that were

more than five feet in length.  *Id*., pg. 60.  Bryant's crew also used a tractor to tote a five hundred

gallon tank of poison to spray on weeds.  *Id*., pg. 64.  Bryant acknowledged that operating this

machinery in the medians of I-20 and Highway 165 was very dangerous work.  *Id*., pgs. 53, 67.

b)      Bryant's November 1, 2011, Accident

On November 1, 2011, Bryant and his crew were assigned to clear some overgrown lots

in the city.  (Bryant Depo. Def. MSJ, Exh. 5, pg. 106).  In so doing, Bryant drove Work Truck

Unit 8090 (the Ford F-350), carrying two of his crew (Carlos Adams and John Coleman) to a

---

[1]  *See* Photos Attach. as Exh. G to Cecil Janway Jr. Affidavit; Def. MSJ, Exh. 1.

[2]  *See also* Photos Attach. as Exh. H to Cecil Janway Jr. Affidavit; Def. MSJ, Exh. 1.

4

vacant house on the corner of Malvern and South Grand streets in Monroe, described by Bryant as an overgrown lot, with grass that was approximately three to four feet tall.  *Id.*, pgs. 24, 106-109.  According to Bryant, he brushed the bottom side of the truck against a small bush as he drove the truck into the yard.  *Id.*, pg. 25.  He explained that he heard a "little scrape."  *Id*. Bryant exited the truck and confessed to his crew, "oh yeah, I did hit a bush going in the yard." *Id.*[3]  Bryant said that his crew members, Adams and Coleman, looked at the truck and said "Jesse hit this bush, got a dent in it."  *Id.*, pg. 111.[4]  Bryant does not deny that he hit the bush.  *Id.*, pg. 140.  However, he disclaimed responsibility for the dent because he believed that it preexisted the incident.  *Id*.

Bryant did not report the incident to his superior(s).  *Id.*, pgs. 24-25.  According to Bryant, he and his crew regularly ran over and struck bushes when they pulled the truck into yards.  *Id*.  Unfortunately for Bryant, however, at least one of his crew members, Russell Marshall, believed that this was a reportable event.  (Marshall Depo., pg. 16; Pl. Sur Reply, Exh. 1).  After waiting in vain for several days to see whether Bryant would report the incident himself, Marshall reported the matter to Don Hopkins on Friday, November 4, 2011.  *Id.*,

---

[3]  Bryant further agreed that he *ran into* a small bush in the front yard.  *Id.*, pg. 21; *see also* Photos; Def. MSJ, Exh. 4; Bryant Depo., pgs. 106-107.

[4]  In his statement, Carlos Adams indicated that he did not notice any damage at the time of the incident, but noticed a dent in the truck the following day.  (Carlos Adams Statement; Exh. D to Cecil Janway Affidavit; Def. MSJ, Exh. 1).  John Coleman stated that he did not notice any damage to the truck.  (John Coleman Statement; Exh. D to Cecil Janway Affidavit; Def. MSJ, Exh. 1).  However, another crew member, David Wilson, stated that he noticed the dent in the truck when Bryant pulled out of the yard.  (David Wilson Statement; Exh. D to Cecil Janway Affidavit; Def. MSJ, Exh. 1).

Hopkins Affidavit; Def. MSJ, Exh. 2.[5]  In Hopkins' words:

> [o]n <u>Friday, November 4</u>, 2011, I was told by Beautification Division employee
> Russell Marshall, who was a member of Bryant's labor crew, that on the
> preceding <u>Tuesday, November 1</u>, 2011, Bryant had been involved in an on-the-job
> accident while driving a City Public Works truck, which was a Ford F-350 Super
> Duty Truck.  I was told Bryant had run over a tree stump (later described as a
> bush) on a job site, and that he had damaged the truck by causing a dent.  Bryant's
> immediate supervisor, Sam Dickey, was absent from work the following <u>Monday,
> November 7</u>, 2011, and on <u>Tuesday, November 8</u>, 2011, I asked Sam Dickey to
> examine the truck Bryant had been driving at the time of the accident.  Sam
> Dickey examined the truck that day, and reported to me he had seen a dent on the
> passenger side of the truck, although he did not know how long the dent had been
> in the truck.  I later spoke with members of Bryant's work crew, who confirmed
> that Bryant had been involved in the referenced accident on November 1, 2011.

*Id*. (emphasis in original).

Hopkins also spoke with Bryant who admitted that he had run over the bush, but claimed that the

damage to the truck preexisted the accident.  *Id*.

Based on the information provided to him through discussions with Bryant's labor crew,

and Sam Dickey's observation of the dented truck, Hopkins concluded that Bryant had been

involved in a first offense "Simple Fault" accident pursuant to the Public Works Department's

Accident/Incident Policy, which required an employee drug test, even in cases of minimal

damage.  (Ex. 2, Hopkins Aff*.,* ¶11; Ex. 1, Janway Aff. Ex. B, Accident/Incident Policy).[6]

Bryant's accident also triggered his need to undergo a drug test pursuant to the City's Drug Test

---

[5]  Apparently on an earlier occasion, Marshall had been required to undergo a drug test
when he had damaged the rear of the truck.  (Bryant Depo., pgs. 68-69).

[6]  Under the Accident/Incident Policy, "[a]n employee is at simple fault when the
accident/incident is one which posed minimal danger to life and/or property and is one that was
the result of simple inadvertence, e.g., backing into a stationary object."  *Id*.  Furthermore, the
"Consequences" of a simple fault accident are, in part:  "1st Offense – Written Reprimand - -
Drug Screen."  *Id*.

Policy [Art 2, Sec. 2.3] as set forth in the Employee Handbook. (Ex. 1, Janway Aff. Ex. A, Bates No. 00382).

On Tuesday, November 8, 2011, Hopkins instructed Sam Dickey to take Bryant to the medical facility for a drug screen.  (Hopkins Affidavit).  Bryant, however, was called away from work that day because of his wife's medical emergency.  *Id*.  Accordingly, on Wednesday, November 9, 2011, at approximately 9:00 a.m., Dickey took Bryant for drug testing at St. Francis-Occumed Clinic, where Bryant provided a post-accident, unobserved urine specimen. *Id*.; Litigation Package for Lab Number [31301249] Specimen ID [35112645], Sec. 1A; Pl. Opp., Exh. 7 [doc. # 44].

Also on November 9, 2011, Hopkins issued Bryant a "simple fault" written warning for running over a bush and denting the City truck.  (Janway Affidavit, Exh. C).  Bryant signed the written warning that same day.  *Id*.  The form contained a space for employee remarks, and specified that "[t]he absence of any statement on the part of the <u>employee</u> indicates his/her agreement with the report as stated."  *Id*.  Bryant did not include a statement contesting the circumstances that led to his written warning.  *Id*.

On November 12, 2011, Alere, a drug test analyzing facility in Gretna, Louisiana, reported that Bryant's urine sample had tested positive for marijuana metabolite, with a quantitative value of 78 ng/mL.  (Litigation Package for Lab Number [31301249] Specimen ID [35112645], Sec. 1A; Def. MSJ, Exh. 7 [doc. # 44]).  The drug screen, however, was negative for amphetamines, benzoylecgonine-cocaine metabolites, opiates, and phencyclidine.  *Id*.

According to the Marijuana (THC) fact sheet attached to the drug test report, marijuana has a urine half-life of 48 hours; i.e., every 48 hours the concentration drops by one-half.  *Id*.

Furthermore, it takes four to five days for marijuana to clear from a urine sample for a social

marijuana user.  *Id*.  For someone who smokes marijuana several times per week it takes seven to

ten days for marijuana to clear itself from the urine.  *Id*.  For chronic users, it takes four to six

weeks for marijuana to be clear in the urine.  *Id*.  In addition, "realistic passive inhalation" will

not occur over 4 ng/mL.  *Id*.[7]

On December 8, 2011, the City, via Hopkins, issued a Pre-Determination Hearing letter

ordering Bryant to attend a "pre-determination" hearing set for Thursday, December 15, 2011, at

9:00 a.m.  (Janway Affidavit, Exh. D; Def. MSJ, Exh. 1).  In the letter, Hopkins advised Bryant

that "considering the results of the investigation and [the] positive drug screening results, it [was

his] intent to recommend [Bryant's] immediate termination to the appointing authority."  *Id*.  The

letter further advised Bryant of his right to counsel and to present witnesses at the hearing to

refute the charges and the evidence against him.  *Id*.

Bryant attended the pre-determination hearing on December 15, 2011.  *See* Hopkins

Affidavit; Bryant Depo., pg. 139.  Nevertheless, in correspondence dated January 17, 2012,

Hopkins notified Bryant that, effective January 19, 2012, his employment with the City's

Sanitation Division was terminated.  (Janway Affidavit, Exh. E).

c)    The City's Drug Testing Policy

The City adopted its "Policy and Procedure Relative to Drugs and Alcohol" (the "Policy")

on July 28, 1992, through passage of Ordinance No. 9315, which was amended by Ordinance No.

9402 on September 14, 1993.  (Affidavit of Carolus Riley & Exhs. A-C referenced therein; Def.

_____

[7] On November 15, 2011, Bryant provided another urine sample, which tested negative
for controlled substances.  (Nov. 16, 2011, Drug Test Report; Pl. Opp., Exh. 9).

MSJ, Exh. 3).  The referenced Ordinances are incorporated into the 1996 City of Monroe

Employee Handbook ("Employee Handbook").  *See* Janway Affidavit & Exh. A attached thereto;

Def. MSJ, Exh. 1).  The overriding concerns for employee and public safety are reflected in the

Policy's statement of "Purpose":

> [t]he City of Monroe, Louisiana (hereinafter referred to as "City")
> desires to maintain a safe, healthful and productive environment
> for all of its employees and the public which they serve.
>
> The City recognizes that the use of alcoholic beverages and the use
> of unauthorized drugs by City employees in the work environment
> is a threat to the public welfare and to the safety of the individual
> employee, co-workers, and the public in general.
>
> In order to protect the health, welfare and safety of the public, the
> individual employee and co-employees, and to heighten the
> efficiency and effectiveness of service to the public, the City will
> act to eliminate any substance abuse which increases the potential
> for accidents, absenteeism, substandard performance, poor
> employee morale and damage to the reputation of our community.
> It is the goal of this policy and procedure to eliminate substance
> abuse in the City work environment.

(The Policy and Employee Handbook; Exhs. to Riley and Janway Affidavits, respectively).

The Policy provides for employee drug testing in four categories.  Pertinent here are

Categories I and II, which provide, in pertinent part:

> Sec. 2.2          EMPLOYEE TESTING – CATEGORY I
>
> > A.     Category I - positions where the health, welfare and/or
> > safety of the public, co-employees and the individual
> > employee is at risk shall be deemed "safety sensitive"
> > positions, including but not limited to the following:
> >                              * * *
> > operation of motorized vehicles, including
> > automobiles, trucks, tractors, or other heavy
> > equipment
> >                              * * *

9

<u>positions that entail working in dangerous conditions</u>

<u>positions that require the handling or use of chemical substances</u>

B.    All applicants for Category I positions shall be required to satisfactorily pass a substance abuse screening prior to employment or promotion into any Category I position.

C.    All employees who occupy Category I positions shall participate in routine substance abuse screening in accordance with the following:

1.    All employees in Category I positions shall be tested at least once every three (3) years;

2.    All employees in Category I positions shall be subject to random routine substance abuse testing according to the procedures prepared by the Department of Administration, with a least 33 1/3% of the positions being tested each year.

Sec. 2.3    EMPLOYEE TESTING - CATEGORY II

Category II - whenever an employee has an on the job accident or suffers an occupational on the job injury requiring immediate treatment by a doctor or absence from work, or causes an injury to a fellow employee or to the general public which requires treatment by a doctor or absence from work, or where the injury was due to the employee's failure to wear required personal protective equipment or where the property damage of said accident is estimated at greater than $500.00, said employee shall be required to participate in a substance abuse screening test.

*Id*. (emphasis added).[8]

---

[8]  The Policy provides a Category III for "reasonable cause or suspicion" drug testing and Category IV drug testing in relation to an employee's enrollment and successful completion of a

Under the Policy, an "accident" is defined as "any occurrence which causes injury or fatality, produce [sic] physical damage to property or material, or interrupts and/or terminates scheduled work assignments."  (The Policy, § 1.4).

The Policy also includes specific and detailed provisions for the City's Drug Screening Procedure with provisions for Testing Method; Certified Laboratories for Drug Testing; Collection Procedure for Urine Specimens, and the employee's right to review the drug test records.  (The Policy and Employee Handbook).  Finally, under the Policy,

> [a]ny employee who tests positive for alcohol or other unauthorized substance under the above procedures shall be dismissed from the City employment and shall not be considered for future employment for a period of at least twelve (12) months and/or then after satisfying the requirements of Sec. 2.5A [completion of substance abuse counseling or rehabilitation program].

*Id*., § 5.2A.

d)      Bryant's Knowledge of the City's Drug Policy

Bryant knew that the City prohibited employees from coming to work while under the influence of drugs or alcohol.  *See* Bryant Depo., pgs. 166-167, 182.  He also knew that no City employee was supposed to test positive for drugs if tested.  *Id*., pgs. 182-183.  Bryant was aware that if an employee suffered an accident, then he would have to undergo a drug test.  *Id*., pg. 68. Bryant also knew, pursuant to the Public Works Department's Simple Fault Accident/Incident policy, that if a person has an accident – even if he or she were not at fault – then the individual would receive a written reprimand and a drug screen.  *See* Bryant Depo., pgs. 78-79.

---

certified program of substance abuse counseling or rehabilitation.  *See* the Policy §§ 2.4-2.5; Employee Handbook.

**Analysis**

**I.      The City's Drug Testing Policy, as Applied, Did Not Violate the Fourth Amendment**

In *Aubrey v. Sch. Bd. of Lafayette Parish*, the Fifth Circuit synopsized the pertinent law

and inquiry, as follows,

> [t]he fourth amendment guarantees the privacy, dignity and security of persons
> against certain arbitrary and invasive acts by officers of the government or those
> acting at their direction.  By virtue of the fourteenth amendment, the fourth
> amendment governs searches by state as well as federal government officials.
> Further, the fourth amendment is not limited to searches conducted for law
> enforcement purposes but extends to all government searches, including those
> conducted by the government while acting as an employer.  This restraint on
> government conduct generally bars officials from undertaking a search or seizure
> absent individualized suspicion. Searches conducted without grounds for
> suspicion of particular individuals have been upheld, however, in certain limited
> circumstances.
>
> A program which compels government employees to submit to urinalysis is a
> search within the meaning of the fourth amendment because such tests invade
> reasonable expectations of privacy.  Such a drug test therefore must meet the
> reasonableness requirement. The amendment does not proscribe all searches and
> seizures, but reasonableness depends on the nature of the search and seizure.  In a
> situation in which the fourth amendment intrusion serves a special government
> need beyond that of law enforcement, a balancing test is required.  The interest of
> the government must be weighed against the privacy interest of the employee. The
> analysis of the privacy interest should include not only the desire to be free from
> mandatory testing, but also the intrusiveness of the particular program at issue.

*Aubrey v. Sch. Bd. of Lafayette Parish*, 148 F.3d 559, 562 (5th Cir. 1998) (citations omitted).

In addition, the Supreme Court has recognized a special government need for warrantless,

suspicionless searches for government workers that occupy certain safety sensitive positions

where the "risk to public safety is substantial and real."  *Chandler v. Miller*, 520 U.S. 305, 323,

117 S. Ct. 1295, 1305 (1997).

Thus, the threshold issue is whether Bryant occupied a safety sensitive position sufficient

to support warrantless, suspicionless drug testing.  The undersigned notes that courts have found

special needs for various safety sensitive positions including, air traffic controllers, aircraft

maintenance personnel, flight crew members, flight attendants, railroad safety inspectors,

highway and motor carrier safety specialists, lock and dam operators, forklift operators, tractor

operators, engineering operators, and crane operators. *Krieg v. Seybold*, 481 F.3d 512, 518 (7th

Cir. 2007) (compiling cases).[9]  Furthermore, the Fifth Circuit has recognized special needs

sufficient to support suspicionless drug testing for school custodians, bus drivers, and medical

residents. *See Aubrey, supra*; *Jackson v. Metro. Transit Auth.*, 53 F.3d 1280 (5th Cir. 1995)

(unpubl.); *Nobles v. Metro. Transit Auth.*, 62 F.3d 394 (5th Cir. 1995) (unpubl.); and *Pierce v.*

*Smith*, 117 F.3d 866, 868 (5th Cir. 1997).

      In *Aubrey*, the Fifth Circuit noted that a school custodial position was safety sensitive

because the custodian handled various cleaning chemicals and worked with potentially dangerous

machinery such as a lawn mower in a school environment. *Aubrey, supra*.  Similarly, in

*Middlebrooks v. Wayne County*, the Michigan Supreme Court recognized that operation of a

riding lawn mower on highway medians and embankments, and driving front-end loaders and

trucks are the kinds of activities that might cause serious injury stemming from "momentary

lapse[s] of attention" characteristic of illegal drug use. *Middlebrooks v. Wayne Cnty.*, 446 Mich.

151, 163, 521 N.W.2d 774, 780 (1994).  Thus, the court concluded that the Fourth Amendment

did not bar the state from requiring urinalysis testing for workers who apply for those position(s).

*Id*.

      In light of the foregoing authorities, the undersigned readily concludes that Bryant

---

     [9] On the other hand, some courts have held that jobs that require driving cars or vans do
not constitute safety sensitive positions sufficient to support random drug testing. *Id*. (citations
omitted).

occupied a safety sensitive position.  Not only did Bryant drive a large pickup truck to transport his crew, he also was responsible for the safety of his crew and the motoring public whilst his crew mowed grass along the City's busy state and interstate right of ways.  Moreover, Bryant assisted his crew with these activities, which entailed use of dangerous grass cutting machinery and a chemical spraying truck containing herbicides.  In fact, Bryant agreed that operating the machinery along Interstate 20 was *very* dangerous work; further, if one were not careful, one could be injured.  (Bryant Depo., pg. 67).

The court also takes judicial notice of the fact that at least two secondary schools and one primary school are located no more than two blocks away from Highway 165 within the City limits along the right of way that Bryant and his crew maintained.  Bryant and his crew's use of dangerous mowing machinery and chemicals in the vicinity of these schools and their students further demonstrate that his position constituted a "special need" exception to the Fourth Amendment.

In enacting its drug-testing policy, the City articulated that it had an interest in protecting its workers and the public.  *See* the Policy.  In particular, the City wished to eliminate substance abuse by city workers that had the tendency, *inter alia*, to increase the potential for accidents.  *Id*. In so doing, the City created four categories of employee testing.  Category I applies to employees in "safety sensitive" positions that potentially imperil the "health, welfare and/or safety of the public, co-employees and the individual employee . . ."  *Id*.  Category I employees must undergo substance abuse screening prior to employment or promotion into a Category I position.  *Id*.  In addition, each Category I position must be tested randomly at least once every three years.  *Id*.  Bryant does not contest that he held a "safety sensitive" position as set forth in

14

the 1996 City of Monroe Employee Handbook.  (Pl. Resp. to Defs' Statement of Material Facts).

The Policy also mandates drug testing for any employee who, *inter alia*, "has an on the job accident . . . **or** where the property damage of said accident is estimated at greater than $500.00 . . ."  (The Policy, § 2.3) (emphasis added).  By its terms, the Policy's Category II accident-based testing may be triggered solely by an "on the job accident."  *Id*.  There is no requirement for fault by the employee; thus, the additional $500 property damage threshold is an alternative trigger that effectively is rendered superfluous by the broader "on the job accident" catchall.

In addition, under the City's Department of Public Works' Accident/Incident Policy, the consequences for an employee who is involved in a simple fault accident/incident include a written reprimand and a drug screen.  *See* Accident/Incident Policy; Janway Affidavit, Exh. B.

The court finds that the City has a substantial interest in its drug testing procedures, at least as applied in this case.[10]  Bryant was employed in a safety sensitive position and, by his own

---

[10]  The City has not demonstrated that there was (or is) an extensive drug or alcohol use problem with its employees who hold safety sensitive positions.  This omission, however, is not fatal:  "[a] demonstrated problem of drug abuse . . . [is] not in all cases necessary to the validity of a testing regime, but . . . some showing does shore  up an assertion of special need for a suspicionless general search program."  *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 835-36, 122 S. Ct. 2559, 2567-68 (2002) (citing *Chandler v. Miller*, 520 U.S. 305, 319, 117 S.Ct. 1295 (1997)) (internal quotation marks omitted).  Furthermore, there is no need to demonstrate a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing.  *See Earls, supr*a; *Aubrey, supra*.

In *National Treasury Employees Union v. Von Raab*, the Supreme Court upheld the drug testing of customs officials on a purely preventive basis, without any documented history of drug use by such officials.  *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 673, 109 S. Ct. 1384, 1395 (1989).  In *Von Raab*, no more than 5 out of 3,600 employees tested positive under the program.  *Id*.  Nonetheless, the Court overcame the lack of evidence relating to drug use by noting that "drug abuse is one of the most serious problems confronting our society today" and that programs to prevent and detect drug use among customs officials could not be deemed unreasonable.  *Id*., *see also Earls, supra*.

admission, brushed against, hit, struck, or otherwise ran over a bush while driving a City pickup truck.  Moreover, according to Bryant, the truck's contact with the bush was perceived to be significant enough that he and his crew members exited the vehicle to inspect it for damage. While Bryant maintained that it was commonplace for his crew to drive over bushes in this manner, at least one member of his crew disagreed, and thought the incident extraordinary enough to merit a report to Bryant's supervisor for a drug screen.

Bryant contends that there was little or no evidence to attribute the dent in the truck to the impact with the bush.  Again, however, at least one member of his crew, David Wilson, made the connection.  Plaintiff further argues that it was unreasonable for Hopkins to rely on Wilson's statement because Wilson has a history of alcohol and drug charges, and because Wilson ultimately was promoted to Bryant's position after his discharge.  Nonetheless, the City's Policy and the Department of Public Works Accident/Incident Policy called for a drug screen following an employee's accident or incident *regardless of the amount of damage that ensued*.

Plaintiff persists that it was unreasonable for the City to require him to undergo a drug test merely because of a minor collision with a bush that caused no more than negligible property damage.  However, drug testing under these circumstances still promotes public safety because it provides an opportunity for intervention *before* greater harm occurs.  *See Tanks v. Greater Cleveland Reg'l Transit Auth.*, 930 F.2d 475, 480 (6th Cir. 1991) (citations omitted).  The City is not required to wait until an employee is involved in a serious accident involving significant injury to life or property before it may insist upon  a drug test.  Depending upon when Bryant last underwent a random drug test under Category I of the City's Policy, the City otherwise may have

16

had to wait up to three years before Bryant took another random test.[11]

Plaintiff further argues that even if a fault-based accident with minor damage were to provide reasonable grounds for a drug test, any nexus between the two became too attenuated once the City permitted eight days to lapse before it eventually sent Bryant for a drug test.  In support of his argument, Plaintiff cites various guidelines, laws, and regulations that urge drug testing as soon as practicable after the triggering event.  *See e.g.*, U.S. Labor Dept. Drug Testing Guidelines (it is usually recommended that post-accident testing be effected within 12 hours); La. R.S. 23:1081 (an employer may demand that the employee undergo drug and alcohol testing *immediately* after an accident in order to determine whether the employee was under the influence and therefore ineligible for workers' compensation benefits); U.S. Department of Transportation ("DOT") Regulations, 49 C.F.R. § 382.303 (a commercial vehicle driver must undergo a drug test as soon as practicable after a defined occurrence); and U.S. Federal Transportation Authority ("FTA") Regulations, 49 C.F.R. § 655.44 (requiring an employer to drug and alcohol each covered employee as soon as practicable, but within 32 hours after a covered accident).

The court observes, however, that at least part of the rationale requiring the temporal nexus between the accident and testing in the foregoing laws and regulations is to discern whether the accident was caused by the employee's drug or alcohol use.  Clearly, as more time elapses, and the effects of alcohol and drugs naturally dissipate from the body, the relevancy of

---

[11]  In fact, in the Department of Labor Drug Testing Guidelines adduced by Plaintiff, some employers expand the post-accident test trigger to include incidents where an accident or injury was averted, i.e., cases that involved no damage.  *See* U.S. Labor Dept. Drug Testing Guidelines; Pl. Opp. Memo., Exh. 8.

testing becomes more attenuated for *purposes of determining the cause of the accident*.

Nevertheless, because of its relative unpredictability, post-accident/incident drug testing serves

an additional purpose in deterring and uncovering on the job drug use:

> [b]y ensuring that employees in safety-sensitive positions know they will be tested
> upon the occurrence of a triggering event, the timing of which no employee can
> predict with certainty, the regulations significantly increase the deterrent effect of
> the administrative penalties associated with the prohibited conduct concomitantly
> increasing the likelihood that employees will forgo using drugs or alcohol while
> subject to being called for duty.

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 629-30, 109 S. Ct. 1402, 1420 (1989).

In other words, post-accident drug testing shares the deterrent characteristics of random drug

testing.

Plaintiff further argues that the delayed drug test in this case was ineffectual for purposes

of determining substance abuse as a cause of the accident because casual marijuana use can only

be detected in urine for a period of three to four days.  Plaintiff's argument, however, overlooks

the afore-mentioned deterrent effect of post-accident testing.  In addition, according to the

Marijuana Fact Sheet included in the Litigation Package submitted into evidence by both sides in

this case, it takes seven to ten days for marijuana to dissipate from the system of a moderate user.

(Pl. Opp. Memo., Exh. 7 [doc. # 44]).  Also, the drug screen tested not only for marijuana, but for

other controlled substances such as barbiturates which remain detectable for up to ten days.  *See*

Alere Drug Test Report; Pl. Exh. 7 and DOL Drug-Free Workplace Advisor; Pl. Exh. 8.  Thus,

the delayed drug screen in this case remains retains a nexus with the accident.[12]

---

[12]  The court notes that there is no indication that the City purposefully delayed the drug
test for some nefarious or improper purpose.  Hopkins was not advised of the accident until three
days after the event on Friday.  Moreover, before requiring the drug test, he made inquiries with
Bryant's crew and discussed the matter with Bryant's immediate supervisor, who did not return
to work after the weekend until Tuesday, November 8.  The drug test would have taken place no

Paired with the City's substantial interest in administering a drug test under the instant circumstances, the court stresses that Bryant's privacy interest was minimal.  First, Bryant provided an unobserved urine sample at a medical clinic.  *See Earls, supra* (finding sample collection minimally intrusive where a faculty member listened outside a closed restroom stall for the student to produce a sample).  Second, there is no evidence that Bryant was required to disclose any personal medical information, nor was the urinalysis used to determine the presence of anything other than drugs.  *See Aubrey, supra*.  In addition, Bryant had a diminished expectation of privacy because his job was a safety-sensitive position that already required him to undergo drug testing on a random basis, and at the time that he was hired/promoted. .*Aubrey, supra*.  Akin to the custodial employees in *Aubrey*, Bryant and other safety-sensitive City employees "reasonably should expect effective inquiry into their fitness and probity . . ." *Id*.

Bryant endeavors to distinguish *Aubrey* on the grounds that his drug testing was not random, but instead accident-inspired.  As a result, Bryant contends that resolution of this case should be governed by *United Teachers of New Orleans v. Orleans Parish Sch. Bd. Through Holmes*, where the Fifth Circuit invalidated a *no fault*, post-accident drug testing policy for *all* school employees, largely because the policy's purpose was to defeat workers' compensation claims, not to protect the safety of students.  *See United Teachers of New Orleans v. Orleans Parish Sch. Bd. Through Holmes*, 142 F.3d 853, 854 (5th Cir. 1998).  Although, as written, the City's Policy for Category II employees appears broad enough to run afoul of the Fifth Circuit's concerns as expressed in *Orleans Parish School Board, supra*, the drug test administered in this

---

later than the 8th, but for Bryant's having to leave work to tend to his wife.  In short, the testing occurred as soon as practicable after the event.

case stemmed from a fault-based accident precipitated by an employee who held a safety sensitive position.  As such, this case is more analogous to *Aubrey*.

Plaintiff's unadorned mantra that *Aubrey* remains inapposite because the testing therein was random proves unavailing.  If anything, fault-based post-accident testing affords greater protection to an employee than a random test, because it requires some misstep by the employee. Furthermore, a drug test following an employee-caused accident/incident is *more suggestive* of possible drug use than a random, no fault-based drug test.  In any event, when, as here, there was a delay between the accident and the testing, then the testing takes on the characteristics of a random, unpredictable drug test that the Fifth Circuit endorsed in *Aubrey*.  Indeed, reasonableness under the Fourth Amendment does not require employing the least intrusive means.  *Earls, supra*.

In sum, the undersigned finds that, under the facts of this case, the City's interest in requiring a post-accident (albeit, with minimal to no resulting damage), fault-based, suspicionless drug test for a worker who holds a safety-sensitive position, and who already was subject to drug testing, both randomly and at the time of his hire, more than outweighs the worker's minimal privacy interests in this context.  *Aubrey, supra*.  Therefore, no rational juror could conclude that the warrantless, suspicionless drug test at issue here transgressed Plaintiff's Fourth Amendment rights, as extended to the States via the Fourteenth Amendment.

## II.  Bryant's Discharge did not Violate his Fourteenth Amendment Right to Substantive Due Process

To succeed on a substantive due process claim under the Fourteenth Amendment in the context of public employment, a plaintiff must show that "(1) he had a property interest/right in

his employment and (2) his termination was arbitrary or capricious."  *Bolton v. City of Dallas, Tex.*, 472 F.3d 261, 263 (5th Cir. 2006) (citations omitted).  However, "substantive due process requires only that public officials exercise professional judgment, in a nonarbitrary and noncapricious manner, when depriving an individual of a protected property interest."  *Lewis v. Univ. of Texas Med. Branch at Galveston*, 665 F.3d 625, 630-31 (5th Cir. 2011) (citations omitted).  Even if "reasonable minds could disagree on the propriety of [the plaintiff]'s termination" that does not suffice to overcome a public official's qualified immunity defense against a substantive due process claim.  *Id.*  Rather, the plaintiff must demonstrate that the decision was "made without a rational connection between the known facts and the decision or between the found facts and the evidence."  *Id*.  Stated differently, Plaintiff had the burden to show that "the abuse of power by the state official shocks the conscience."  *Id*.

Assuming for purposes of this motion that Bryant enjoyed a property interest in his employment, no reasonable juror could conclude that Hopkins and the City's decision to terminate his employment was arbitrary or capricious.  Indeed, as one circuit has recognized, given that drug abuse is one of society's most serious problems, a "City's decision to treat a positive drug test as 'just cause' for immediate discharge of employees deemed safety sensitive, though harsh, is not irrational and cannot be held offensive to the Constitution."  *Rutherford v. City of Albuquerque*, 77 F.3d 1258, 1263-64 (10th Cir. 1996) (citations omitted).

Furthermore, there is no evidence that the City arbitrarily or discriminatorily applied its drug policy to Bryant.  In fact, Bryant's direct supervisor, Sam Dickey, underwent drug testing following accidents, including in the aftermath of at least one minor accident.  (Dickey Depo., pgs. 15-16; Def. Exh. 7).  Moreover, even Don Hopkins underwent drug testing following an

accident.  (Hopkins Depo., pg. 46; Def. Exh. 6).

Finally, to the extent that Bryant contends that his dismissal was premised upon Hopkins'

decision to require him to submit to a drug test despite less than conclusive proof that Bryant had

caused the dent in the truck, the court observes that the City's Drug Policy and the Department's

Accident/Incident Policy requires a drug test following an accident, particularly when the

employee is at fault, but even if the damage is negligible.  *See* discussion, *supra*.  In addition,

Bryant admitted to Hopkins and/or Dickey that he hit the bush with the truck.  *See Lewis supra*

(even if complaints by co-employees that contributed to employee's discharge stemmed from

their desire to rid themselves of the employee, the termination decision nonetheless did not

violate due process because it was supported by a basis in undisputed fact).[13]  In sum, Bryant has

not demonstrated that the circumstances of his discharge "shock the conscience."

### III.    Bryant's Drug Testing and Discharge did not Violate Louisiana Law or the Louisiana Constitution

Insofar as Plaintiff contends that his accident-inspired drug test violates Louisiana law,

the court notes that Louisiana law authorizes a public employer to provide a drug test sample

following an accident that occurred during the course and scope of his employment.  La. Rev.

Stat. Ann. § 49:1015.[14]  Here, there is no question that Bryant struck or hit a bush with a city-

---

[13]  The court has not relied on the opinion of Plaintiff's expert accident reconstructionist, Marshall Lyles or on the repair estimates for the dent in the truck recently obtained by Defendants.  *See* Lyles Depo., Pl. Exh. 2 and Affidavits; Def. Reply Memo., Exh. 2 (in globo). These sources of proof were not before Hopkins and the City at the time that they rendered their decisions.  *See Wren v. Towe*, 130 F.3d 1154, 1159 (5th Cir. 1997) (it is the information known at the time of seizure and the reasonableness of the inferences drawn from such information that is determinative).

[14]  Louisiana law also authorizes drug testing based upon reasonable suspicion of drug use, as part of a rehabilitation agreement, as a condition of hiring, or randomly for those

owned truck while acting within the course and scope of his employment.

Plaintiff also argues that the drug test violated Article 1, § 5 of the Louisiana Constitution which specifies that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."  LA. CONST. ART. I, § 5.  Although the Louisiana Constitution's affirmative right to privacy is one of the most conspicuous instances in which Louisiana has chosen a higher standard of liberty than that afforded by jurisprudence interpreting the federal constitution, both the Fourth Amendment and Article I, § 5 protect only reasonable expectations of privacy.  *Banks v. Dep't of Pub. Safety & Corr., Louisiana Training Inst.-E. Baton Rouge*, 598 So. 2d 515, 518 n3 (La. App. 1ˢᵗ Cir. 1992) (citing *inter alia, State v. Hernandez*, 410 So. 2d 1381, 1385 (La. 1982)).  Furthermore, Louisiana's additional protection against invasions of privacy may be traced back to the expanded right to marital privacy and in response to fears of unrestrained gathering and dissemination of information on individuals via computer banks – circumstances not present here.  *State v. Jackson*, 764 So. 2d 64, 71 (La. 2000) (citations omitted).  In addition, despite imprecise or loose dicta in *Richard v. Lafayette Fire & Police Civil Serv. Bd.*, 8 So. 3d 509, 514 (La. 2009), there is no indication that Louisiana would afford Plaintiff any greater protection than that afforded by the Fourth Amendment under the facts of this case.

Finally, Plaintiff contends that his discharge violated his due process right under the Louisiana Constitution, Article 1, § 2, which dictates that, " [n]o person shall be deprived of life, liberty, or property, except by due process of law."  However, the "scope of protection under the Louisiana Constitution parallels the Fourteenth Amendment of the United States Constitution."

---

employees who occupy safety-sensitive positions.  *Id*.

*Johnson v. City of Monroe*, 2007 WL 1521436, *5 (W.D. La. May 21, 2007).  Having determined

that Defendants did not violate Plaintiff's substantive due process rights under the Fourteenth

Amendment, the court necessarily concludes for the same reasons that Plaintiff's rights were not

violated under the Louisiana equivalent.

## IV.    Qualified Immunity

Defendants also invoke the affirmative defense of qualified immunity.  "The doctrine of

qualified immunity protects government officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir.

2009) (quoted sources omitted).  When a defendant invokes qualified immunity, the burden shifts

to plaintiff to establish that the defense is inapplicable.  *Id*.  (citation omitted).  Plaintiff's burden

is two-pronged.  *Id*.  First, he must demonstrate that defendants violated a constitutional right

under current law.  *Id*.  "Second, he must claim that the defendants' actions were objectively

unreasonable in light of the law that was clearly established at the time of the actions complained

of."  *Id*.  (quoted source and internal quotation marks omitted).  The courts are "permitted to

exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances of the particular case at hand."

*Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (*citing Pearson v. Callahan*, 808 U.S.

2009, 129 S.Ct. 808  (2009)).

In the case *sub judice*, Bryant has not shown that Defendants violated his constitutional

rights.  Accordingly, further analysis of the qualified immunity defense is superfluous.  *See Lytle*

*v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (if the alleged conduct did not violate a

24

constitutional right, then the inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity).

## Conclusion

For the foregoing reasons, the court finds that there is no genuine dispute as to any *material* fact, and that movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56. Therefore, the motion for summary judgment [doc. # 35] filed by Defendants, the City of Monroe and Don Hopkins, is hereby GRANTED.  Judgment shall issue dismissing with prejudice Plaintiff's claims, in their entirety, at his cost.

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 31st day of October 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE